**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

J.G. WENTWORTH SSC
  LIMITED PARTNERSHIP,

              Plaintiff,

      v.                                        C-1-01-192

LINDA CALHOUN WILLIAMS,
  Individually and as Executor of the
  Estate of Ramona F. Calhoun,

              Defendant.

## <u>ORDER</u>

This matter is before the Court for a decision on the merits following a trial to the Court.

### I. Introduction

Plaintiff J.G. Wentworth SSC Limited Partnership ("Wentworth") filed this action against Linda Calhoun Williams ("Williams"), Executrix of the Estate of Ramona F. Calhoun ("Calhoun Estate") and a legatee of that estate, asserting a claim for payments allegedly due from the Calhoun Estate, plus punitive damages, fees, costs, and interest. The claim arises out of Wentworth's seven purchases of future payments purportedly owed to Ramona Calhoun under a First Colony Life Insurance Company ("First Colony") Annuity Policy that was issued as part of a structured settlement. Wentworth asserts five claims : (1) a claim for breach of the Purchase Agreement and the Amendments entered into by Calhoun and Wentworth, based on Williams' rejection of Wentworth's claim against the Calhoun Estate, for which Wentworth requests relief in the form of a declaration and order directing Williams and First Colony to make all payments as set forth in Calhoun's Last Will and Testament directly to Wentworth (Count One); (2) a claim that the Calhoun

1

Estate has been unjustly enriched by Williams' rejection of Wentworth's claim (Count Two); (3) a claim for conversion based on Williams' refusal to comply with Wentworth's demand for return of the First Colony annuity payments belonging to Wentworth (Count Three); (4) a claim for intentional misrepresentations allegedly made by Williams through her counsel (Count IV); and (5) a claim for breach of fiduciary duty by Williams based on Williams' alleged misleading of Wentworth through her misrepresentations and failure to honor Wentworth's claim.

As relief, plaintiff seeks compensatory and punitive damages; reasonable attorneys fees, costs and interest; a declaration and order that all monies due from the First Colony Life Insurance Company Annuity Policy No. 0,430,597 that are now part of, or have been a part of, the Calhoun Estate are to be paid immediately to Wentworth; a declaration and order that First Colony make specified payments to Wentworth; and judgment in the amount of $35,370.55 plus interest and costs or, in the alternative, an order requiring Williams to deliver certain annuity payments that Calhoun agreed to deliver to plaintiff, if it is determined that she owned the rights to these annuity payments, in the amounts of $20,000.00 due November 1, 2000, $10,000.00 due November 1, 2000, and $35,000.00 due November 1, 2003.

Defendant has raised several affirmative defenses to Wentworth's claims. They are: (1) Wentworth committed usury in violation of Ohio Rev. Code § 1343.01, so that amounts received by plaintiff to date in excess of the statutory interest rate at the time the Purchase Agreement and the Amendments were entered into must be applied toward principal, and any future recovery must be reduced by the amount of the usurious interest charged; (2) equitable estoppel; (3) bad faith; (4) fraud in the inducement; (5) unclean hands; (6) duress; (7) illegality; and (8) equitable set-off. Defendant has also asserted a counterclaim against Wentworth claiming that the payments to

Calhoun were unconscionably meager and the transactions are therefore illegal, usurious, and in violation of public policy. Defendant demands that the Purchase Agreement and the Amendments be found null and void and that the Calhoun Estate be awarded compensatory and exemplary damages and reasonable attorney fees and costs. Defendant further claims that the payments should be reformed to comply with Ohio usury laws, and specifically Ohio Rev. Code § 1343.01, which provides for interest at a rate not in excess of 8%. Wentworth contends that defendant's counterclaim is barred by the defenses of contract, accord and satisfaction, disclosure, estoppel, laches, payment, waiver, and fraud.

In the joint final pretrial order, defendant states as a proposition of law that she is entitled to damages on her counterclaim under Ohio's Small Loans Act, Ohio Rev. Code § 1321.01, et seq. Defendant contends that one of the transactions at issue in this case involved a loan amount of $3,191.00, and the interest rate charged exceeds the maximum rate specified in Ohio Rev. Code § 1321.13. Defendant asserts that, as a result (1) the contract governing the transaction is void and Wentworth has no right to the principal, interest, or charges contained therein, and (2) Wentworth must forfeit, under Ohio Rev. Code § 1321.14, twice the amount of interest for which the parties contracted.

Defendant also states as a proposition of law that she is seeking relief under the Consumer Sales Practices Act, Ohio Rev. Code §§ 1345.02 and 1345.03, claiming that Wentworth's conduct in dealing with Calhoun was "unfair and deceptive" and "unconscionable" in violation of these provisions of the Act. Defendant claims that she is accordingly entitled to rescind the contracts and recover her damages and attorney fees.

As relief on her claims, defendant requests rescission of the contracts; a finding that plaintiff

3

violated the Consumer Sales Practices Act, and an award of attorney's fees under § 1345.09(F)(2); a finding that the contracts are usurious and, if the contracts are not voided or rescinded, an order reforming the payments to an interest rate of 6% or 8% with appropriate credits and set-offs; and a finding that certain payments made by Wentworth must be forfeited because the Calhoun Estate is being enriched, but not unjustly enriched, or, in the alternative, should the Court order repayment of those amounts, an order nullifying the testamentary provision in the document submitted as Ramona Calhoun's Last Will and Testament for the reason that there was a failure of consideration for Calhoun's inclusion of that provision in her Will and/or a mutual mistake.

The parties have each argued their positions under Ohio law. The court therefore will apply Ohio law to the parties' claims.

## II. Defendant's propositions of law

At the commencement of trial, Wentworth moved to exclude any testimony, exhibits, or evidence pertaining to (1) defendant's propositions of law raised in the joint final pretrial order concerning alleged violations of Ohio Rev. Code §§ 1782.49 and 1782.54, which pertain to Wentworth's capacity to bring this action; (2) a violation of the Small Loans Act, § 1321.01, et seq.; and (3) violations of the Consumer Sales Practices Act, § 1345.01, et seq. The Court denied the motion as untimely. The Court did not, however, rule on whether it would permit defendant to pursue the claims/defenses asserted in these propositions of law. The Court will now address these issues.

Defendant may not pursue the affirmative defense of lack of Wentworth's capacity to bring this action. Following submission of the joint final pretrial order, the Court issued an order disposing of defendant's motion for summary judgment wherein the Court determined that defendant

4

had waived this affirmative defense (doc. 74). There is no basis for departing from this prior ruling.

The Court will not consider whether Wentworth committed violations of the Small Loans Act and the Consumer Sales Practices Act because of defendant's failure to raise these issues in a timely manner. In her amended answer, defendant raised a counterclaim for violation of public policy based on allegations that payments to Calhoun were usurious and unconscionable. Defendant also asserted usury as an affirmative defense pursuant to Ohio Rev. Code § 1343.01, which specifies the maximum rate of interest to which the parties to a "bond, bill, promissory note, or other instrument of writing for the forbearance or payment of money at any future time" may stipulate. Defendant sought relief under Ohio Rev. Code § 1343.04, which provides the remedy where usurious interest has been charged. Defendant did not allege in her amended answer violations of the Small Loans Act, which provides, with specified exceptions, that "No person shall engage in the business of lending money . . . in amounts of five thousand dollars or less, or exact, contract for, or receive, directly or indirectly, on or in connection with any such loan, any interest and charges that in the aggregate are greater than the interest and charges that the lender would be permitted to charge for a loan of money if the lender were not a licensee, without first having obtained a license from the division of financial institutions . . ." Ohio Rev. Code § 1321.02. Nor did defendant allege violations of the Consumer Sales Practices Act, which prohibits unfair, deceptive, or unconscionable practices in connection with consumer transactions. Wentworth did not have notice that defendant intended to pursue these counterclaims prior to the close of discovery, these propositions of law involve legal issues that the parties have not fully addressed, and Wentworth would be prejudiced by addition of counterclaims alleging violations of the Acts so late in the proceedings. Moreover, addition of the counterclaim under the Small Loans Act would be futile because the payment

challenged under the Act is not a loan so as to fall within the purview of the Act.  Thus, the Court declines to allow defendant to pursue her claims that plaintiff violated the cited statutory provisions.  To the extent defendant asserts that the transactions are unconscionable, defendant may pursue that defense in conjunction with her counterclaim for violation of public policy.

### III. Admissibility of Pujol testimony/report

Steven Pujol, a Principal and Consulting Actuary employed by Buck Consultants, an employee benefit consulting firm, was called by defendant as an expert witness.  Defendant offered Pujol's testimony and report for the stated purpose of establishing that the amounts Wentworth paid to Calhoun were not fair and reasonable and that the profits Wentworth made were excessive and unconscionable. (Defendant's Exh. F).  Pujol opined that if the transactions in issue were viewed as loans, which he believed to be a reasonable approach, then the interest rate charged by Wentworth was higher than the interest rate that should be allowed.  Further, he expressed his opinion regarding the present value of the rights purchased by Wentworth from Calhoun when they were purchased and concluded that the consideration paid by Wentworth was unconscionably meager.

Plaintiff objected to Pujol's testimony on the ground that Pujol lacks the qualifications to testify on the subject matter he addressed because he is not an accountant and he did not review plaintiff's records prior to testifying or preparing his report.  Plaintiff also raised concerns about Pujol's methodology, objecting that Pujol had not taken into account relevant factors in rendering his opinions.  The Court reserved ruling on plaintiff's objections and permitted Pujol to testify.  The Court ruled that Pujol's report would not be admitted into evidence but would be considered as a demonstrative exhibit. The Court now considers plaintiff's objections to Pujol's testimony.

Fed. R. Ev. 702 governs the admissibility of expert testimony. It provides that,

> [i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The trial court has a general gatekeeping or screening obligation "to exclude from trial expert testimony that is unreliable and irrelevant." *Conwood Company, L.P. v. United States Tobacco Company,* 290 F.3d 768, 792 (6th Cir. 2002)(citing *Hardyman v. Norfolk & W. Ry. Co.,* 243 F.3d 255, 260 (6th Cir. 2001)). The trial court must determine whether the evidence "both rests on a reliable foundation and is relevant to the task at hand." *Id.* In assessing relevance and reliability, the trial court must examine "whether the expert is proposing to testify to (1) specialized knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Id.* (citing *Jahn v. Equine Servs., P.S.C.,* 233 F.3d 382, 388 (6th Cir. 2000)). This assessment requires "a preliminary inquiry into whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts in issue." *Id.*

While Pujol is qualified to state the present value of money, the Court finds that Pujol is not qualified to give an expert opinion regarding the reasonableness of the amounts paid by Wentworth for the annuity payments purchased from Calhoun, and whether plaintiff's profits were excessive and unconscionable. By his own admission, Pujol lacks any knowledge of Wentworth's actual profit margins. In fact, Pujol testified that all actual profits and losses depend on Wentworth's business model, of which Pujol likewise has no knowledge. Because the reasonableness of Wentworth's transactions and the excessiveness or unconscionability of its profits depends upon its actual profits and losses and its business model, and because Pujol lacks knowledge of those facts, he is not

qualified to give an opinion as to the reasonableness of the consideration Wentworth paid to Calhoun.

Moreover, the Court finds that Pujol's testimony is plagued by numerous deficiencies that render it unreliable and irrelevant to a determination of the reasonableness of the profits realized by plaintiff. Importantly, in reaching his opinion, Pujol failed to consider that Wentworth had purchased certain of Calhoun's rights to receive the annuity payments if she was living. He failed to consider the risk assumed by Wentworth that was created by Calhoun's untimely death. Additionally, Pujol proceeded on the assumption that the payments to Calhoun were loans, which they are not, so that the underlying basis for his conclusions is faulty. Pujol also assumed that Wentworth's business is similar to that of a bank, which can borrow money at rates as low as 2%, an assumption that the evidence establishes is not valid. Pujol testified that he does not know what interest rates Wentworth must pay to borrow money or whether a bank will lend against future structured settlement payments; that 25% was a reasonable profit margin assuming an annuity purchased by Wentworth could be turned over the next day, which the evidence establishes is not a valid assumption; that he has no idea of plaintiff's costs; that he does not know if Wentworth has competitors and what other companies in plaintiff's line of business charge; and that he does not know if Wentworth makes a profit on any transaction and whether it made a profit on the transactions with Calhoun. Because Pujol's testimony is based on faulty assumptions and because Pujol lacks knowledge of several factors that the Court deems critical to a determination of the reasonableness of the consideration paid by Wentworth, the Court will accord Pujol's testimony no weight.

### IV. Findings of fact/conclusions of law

Pursuant to Fed. R. Civ. P. 52, the Court hereby sets forth its findings of fact and conclusions of law.  To the extent any factual findings are considered to be conclusions of law, they shall be deemed conclusions of law.  To the extent any conclusions of law are considered to be factual findings, they shall be deemed findings of fact.

### A. Findings of fact

1. On October 22, 1985, Ramona F. Calhoun ("Calhoun") became one of the beneficiaries of Single Premium Settlement Annuity Policy No. 0,430,597 ("Annuity Policy") issued by First Colony.

2. The owner of the policy is Royal Insurance Company.  First Colony, its successor GE Capital, and Royal Insurance Company are not parties to this lawsuit.

3. Under the Annuity Policy, Calhoun had the rights, if living, to receive monthly payments for 240 months certain and certain specific lump sum payments.

4. Originally, the Annuity Policy provided that, at Calhoun's death, the payments that remained to be paid under the Annuity Policy were to be paid to William, Robert, Rhonda, Bryan and Deidre Calhoun to share equally.

5. The Annuity Policy provides that the owner of the Policy, Royal Insurance Company, has the authority to change the beneficiaries.

6.    In a series of complex transactions that she entered into while alive, Calhoun, now deceased,

assigned a portion of her rights in the Annuity Policy.

7.    Calhoun was married to Vernon Howland from 1994 until they divorced some time before or during 1999.

8.    Calhoun had serious health problems during the last several years of her life, including vascular problems. Calhoun underwent vascular surgery in 1998, following which she developed adult respiratory distress syndrome and had to be placed on life support for two to three months.

9.    Defendant Williams is Calhoun's sister and is named in Calhoun's Last Will and Testament as the Executrix and one of the legatees of the Calhoun Estate.  Williams had "power of attorney" as to Calhoun during her 1998 hospitalization and until Calhoun died.

10.   Williams believes that Calhoun was "in a good frame of mind" prior to 1997 or 1998 but that Calhoun started deteriorating in 1997 or 1998. Calhoun's daughter, Rhonda Carroll, testified that her mother was completely deteriorating both physically and mentally in late 1999 and early 2000.  Carroll never suggested to anyone that her mother needed to be declared incompetent.  Calhoun was never declared incompetent and a guardian was never appointed for her.

11.   Gary Pearson, M.D., who is Board certified in family practice, was Calhoun's treating physician from 1995 until Calhoun's death. He treated Calhoun for numerous ailments, including chronic obstructive pulmonary disease, rheumatoid arthritis, and peripheral vascular disease.  Dr. Pearson believes that Calhoun began showing some decline in her mental status from 1998 on.  Although Dr. Pearson never performed a formal mental status examination of Calhoun, he was of the opinion that she was most likely not able to make complex medical or financial decisions from 1998 on.

11

12.   Wentworth is a company involved in the business of purchasing income streams, primarily structured settlements, from individuals receiving payments over a period of time who presently need income. Wentworth is one of approximately ten companies in the nation in this line of business.

13.   Wentworth's costs of doing business include advertising, business overhead, expenses associated with servicing payments, and interest expenses incurred in borrowing money from banks to make payments to the seller of a future payment. In 1996, the interest Wentworth was paying to banks on the money loaned to it was in the neighborhood of 10%.

14.   Approximately 10% to 12% of the transactions that Wentworth completes default.

15.   Wentworth advertises its services around the nation and also obtains business through referrals by attorneys. Wentworth does not make "cold calls" to prospective clients.

16.   After an individual contacts Wentworth, Wentworth asks for a copy of the individual's annuity, reviews a series of options depending on how much money the individual desires, and makes an offer to the individual.

17.   Wentworth requires sellers to have independent representation.

18.   Calhoun contacted Wentworth and, with the assistance and advice of her three different attorneys, entered into a Purchase Agreement and six Amendments to the Purchase Agreement with Wentworth between February 29, 1996 and January 13, 2000, whereby Calhoun assigned her rights in future payments from the Annuity Policy to Wentworth, who in turn paid her cash for the expected payments. The total cash amount Wentworth paid to Calhoun for the expected payments is $122,168.85.

19.     The original Purchase Agreement was dated February 29, 1996. Wentworth paid Calhoun
        $17,761.00 for her rights, if living, to receive 90 monthly payments in the amount of $500.00
        each beginning April 1, 1996 and ending September 1, 2003. (Plaintiff's Exhs. 5).

20.     Calhoun and Wentworth executed a First Amendment to the Purchase Agreement on April
        30, 1996, whereby Wentworth paid $16,182.00 for a lump sum payment of $50,000.00 that
        Calhoun was due to receive on November 1, 2000, if living. (Plaintiff's Exh. 14).

21.     Calhoun and Wentworth executed a Second Amendment to the Purchase Agreement on June
        10, 1996, whereby Wentworth paid $38,267.00 for Calhoun's rights to receive, if living, 87
        monthly payments of $1,500.00 each starting July 1, 1996 and ending September 1, 2003,
        and 26 monthly payments of $1,500.00, beginning October 1, 2003 and ending November
        1, 2005.[1]  (Plaintiff's Exh. 19).

22.     Calhoun and Wentworth executed a Third Amendment to the Purchase Agreement on March
        21, 1997, whereby Wentworth paid $11,397.30 to Calhoun for her rights to receive, if living,
        one lump sum payment of $50,000.00 due on November 1, 2005, with Wentworth retaining
        $25,000.00 and returning the remainder to Calhoun, and one lump sum payment of
        $100,000.00 due on November 1, 2010, with Wentworth retaining $50,000.00 and returning
        the remainder to Calhoun. (Plaintiff's Exh. 26).

---

[1] According to Plaintiff's Exh. 47, exh. A, the 90 monthly payments referenced in
Finding of Fact # 18 were for the amount of $1,500.00, with Wentworth retaining $500.00
monthly and returning the remainder to Calhoun.  According to that same exhibit, the 87
monthly payments of $1,000.00 that Wentworth purchased pursuant to the Second Amendment
were from the remainder already being returned to Calhoun.

23.     Calhoun and Wentworth executed a Fourth Amendment to the Purchase Agreement on July 9, 1997, whereby Wentworth paid $3,191.00 to Calhoun for her rights to receive, if living, one lump sum payment of $35,000.00 from the remainder already being returned to Calhoun from the payment due on November 1, 2010, and one lump sum payment of $100,000.00 due on November 1, 2015,  with Wentworth retaining $50,000.00 and returning the remainder to Calhoun. (Plaintiff's Exh. 31).

24.     Calhoun and Wentworth executed a Fifth Amendment to the Purchase Agreement on December 28, 1998, whereby Wentworth paid Calhoun $12,055.24 for her rights in a $20,000.00 lump sum payment from the remainder already being returned to Calhoun from the payment due on November 1, 2000 (Plaintiff's Exh. 40).  In fact, Calhoun had no rights in the specified payment.  Rather, the lump sum payment due to be paid to Calhoun on November 1, 2000, under the Annuity Policy was $50,000.00, and Wentworth had already purchased from Calhoun her rights in that entire payment under the First Amendment to the Purchase Agreement.

25.   Calhoun and Wentworth executed a Sixth Amendment to the Purchase Agreement on January 13, 2000, whereby Wentworth paid $23,315.31 for Calhoun's rights in a lump sum payment of $10,000.00 from the remainder already being returned to Calhoun from the payment due November 1, 2000, and a lump sum payment of $35,000.00 that was due to be paid on November 1, 2003. (Plaintiff's Exh. 47). In fact, Calhoun had no rights in these two payments. First, as stated above, the lump sum payment due to be paid to Calhoun on November 1, 2000, under the Annuity Policy was $50,000.00, and Wentworth had already purchased Calhoun's rights in this entire payment from her as part of the First Amendment to the Purchase Agreement. Second, no payment was due to be paid to Calhoun on November 1, 2003, under the Annuity Policy.

26.   Attorney Peter Quance represented Calhoun in connection with the Purchase Agreement and the First Amendment to the Agreement. Quance met with Calhoun and discussed the transactions with her, and she authorized the transactions. Quance thoroughly reviewed the pros and cons of at least the first transaction with Calhoun, explained the pitfalls to her, calculated for her the lump sum payments she would receive from Wentworth compared to the payments she would have received under the settlement, and calculated the interest rate for her. Quance did not provide tax or accounting advice in connection with the transactions.

27.   Quance did not feel that the agreements were a good deal for Calhoun. He had reservations about the equity of the agreements which he expressed to Calhoun, but he had no reservations regarding her ability to enter into the agreements.

15

28.    Calhoun expressed no concerns to Quance regarding the transactions he handled.  Quance
       discerned no indication that Calhoun lacked mental capacity or that she had been subjected
       to duress by Wentworth.  No one else indicated to Quance that plaintiff lacked the mental
       capacity to enter into these agreements. Quance was under the impression that Calhoun
       understood the agreements and related documents that she signed, and he believes that
       Calhoun signed the agreements of her own free will.

29.    After advising plaintiff on the first two transactions, Quance had no further involvement in
       Calhoun's transactions with Wentworth.

30.    Attorney Conrad Curren performed legal services for Calhoun in the late 1990's.  Calhoun
       sought Curren's counsel in connection with the Fifth Amendment and the Sixth Amendment.
       Calhoun asked Curren to review and approve or disapprove the Amendments.  Calhoun
       wanted to sign the documents, although Curren did not think it was a good idea. Curren did
       not dissuade Calhoun from signing the documents, as she had started the process at an earlier
       time.

31.    Calhoun told Curren that she understood the transactions, and Curren felt that she did
       understand them based on what she had told him.  Curren believes that he should have done
       more to discourage Calhoun from completing the transactions because she was in very bad
       physical condition.  He thought, however, that she was competent, and he represented to
       Wentworth in writing that she understood the nature and terms of the transactions.
       (Plaintiff's Exh. 45).

32.    Attorney Carroll V. McKinney submitted a letter to Wentworth dated August 7, 1997, stating that his office had acted as legal counsel to Calhoun with respect to a transaction described in the Fourth Amendment to the Purchase Agreement between Wentworth and Calhoun. (Plaintiff's Exh. 35).

33.    In estoppel letters submitted by Calhoun's various counsel on March 13, 1996, April 2, 1997, August 7, 1997, January 4, 1999, and January 13, 2000, counsel stated that they were satisfied that Calhoun was entering into the transactions in question of her "own free will and volition" and that Calhoun was not "under any duress or undue influence relating to the Seller's entry into the transaction contemplated in the Purchase Agreement." (Plaintiff's Exhs. 10, 29, 35, 41, 45).

34.    Calhoun signed the original Purchase Agreement on February 29, 1996. On that same date, Calhoun also signed a testamentary letter, an "Absolute Assignment and Waiver of Claim," a "Special Irrevocable Power of Attorney," and an Authorization. Attorney Quance notarized each of these documents. (Plaintiff's Exhs. 5-9).

35.    The Purchase Agreement provides at paragraph 3(b)(i)(ii):

> b.    Simultaneously with the execution and delivery of this Agreement, Seller shall deliver to Purchaser: (i) a letter of instructions, addressed to the Annuity Company directing that all payments to be made in relation to any of the Assigned Assets after the death of Seller shall be sent directly to the Purchaser, and (ii) a Change of Beneficiary Form changing the beneficiary of the Assigned Assets, after the death of Seller, to "J.G. Wentworth S.S.C., Limited Partnership", as sole beneficiary . . . (Plaintiff's Exh. 5).

36.    On February 29, 1996, Calhoun requested that Royal Insurance Company change the beneficiary of the Annuity Policy to the Calhoun Estate.  (Plaintiff's Exh. 4).

37.    On April 30, 1996, Attorney Quance witnessed the First Amendment to Purchase

Agreement. On that same date, Calhoun signed a Testamentary Agreement and an Authorization, both of which Quance notarized. (Plaintiff's Exhs. 14-16).

36.    As of that date, Ramona Calhoun had the rights to receive payments under the Annuity Policy, if living. In the event of her untimely death, according to the terms of the Annuity Policy, her children were the named beneficiaries who were to receive any remaining payments.

37.    Both Calhoun and her then husband Vernon E. Howland signed the Second Amendment to the Purchase Agreement dated June 10, 1996, a Testamentary Agreement dated June 7, 1996, and an Authorization dated June 10, 1996. Judith Frampton, an employee of the local motor vehicle title office, notarized each of these documents. (Plaintiff's Exhs. 18-20).

38.    On August 30, 1996, Royal Insurance Company authorized, pursuant to Calhoun's request, the change of beneficiary of the Annuity Policy from Calhoun's children to "The Estate of Ramona Calhoun." (Plaintiff's Exh 24). First Colony confirmed the change on September 3, 1996. (Plaintiff's Exh. 25).

39.    The reason the Agreement was changed by the parties to name the Estate rather than Wentworth as the sole beneficiary of the Annuity Policy in the event of the death of Calhoun is unknown.

40.    Both Calhoun and Howland signed the Third Amendment to the Purchase Agreement, a Testamentary Agreement, and an Authorization on March 21, 1997. Frampton notarized each of these documents. (Plaintiff's Exhs. 26-28).

41.    Both Calhoun and Howland signed the Fourth Amendment to the Purchase Agreement on

July 9, 1997, and Calhoun signed a Testamentary Agreement, an Authorization, and a Special Irrevocable Power of Attorney. Pamela Bristley, a local notary, notarized each of these documents. (Plaintiff's Exhs. 31-34).

42.    On January 4, 1999, Calhoun signed the Fifth Amendment to the Purchase Agreement, a Special Irrevocable Power of Attorney, a Waiver of Anti-Garnishment Laws, and an Authorization, each of which Attorney Curren notarized. (Plaintiff's Exhs. 40, 42-44).

43.    Calhoun signed the Sixth Amendment to the Purchase Agreement, a Testamentary Agreement, a Special Irrevocable Power of Attorney, an Authorization, and a Waiver of Anti-Garnishment Laws on January 13, 2000.  Attorney Curren notarized each of these documents. (Plaintiff's Exhs. 47-49).

44.    Calhoun submitted an application signed by her for each of the seven transactions with Wentworth. Four of the applications are also signed by Vernon Howland. (Plaintiff's Exhs. 63-70).  The reasons that Calhoun listed on the applications for the assignment of her rights in the annuity payments included the remodeling of her house, building an addition on the house, paying off bills, including medical and utility bills, paying back borrowed money, moving to a new location, and starting a business.

45.   The checks for the payments to Calhoun by Wentworth for three transactions were made payable to Ramona Calhoun. (Plaintiff's Exhs. 11, 17, 21). A check from Wentworth dated April 9, 1997, was made payable to the order of "Ramona Howland" and Quance. (Plaintiff's Exh. 30). A check from Wentworth dated August 8, 1997, was made payable to the order of Calhoun and "Carroll V. McKinney, Esquire." (Plaintiff's Exh. 36). Two other checks were made payable to the order of Calhoun and Curren. (Plaintiff's Exhs. 46, 50).

46.   Plaintiff executed a "Last Will and Testament" (the "Will") which was prepared and witnessed by Curren on February 1, 2000. (Plaintiff's Exh. 53). Calhoun instructed Curren as to what to include in the first part of the Will and gave Curren the verbiage included in the Will as Item XIII, which Wentworth had sent to Calhoun. Item XIII instructs the Executor or Executrix to inform First Colony to continue, without interruption, to send the checks issued under the Annuity Policy to J.G. Wentworth, S.S.C. Limited Partnership. The Will further states: "Do not under any circumstances attempt to deny them  or permit them to be denied the benefits of this policy as set forth herein. No one other than J.G. Wentworth S.S.C. Limited Partnership has any interest whatsoever in the payments." (Plaintiff's Exh. 54).

47.   During her lifetime, Calhoun performed all of her contractual obligations under the contracts with Wentworth.

48.   Wentworth performed all of its contractual obligations under the contracts with Calhoun.

49.    Calhoun had the mental capacity to understand and freely enter into each of the five transactions with Wentworth that occurred before 1998, i.e., the Purchase Agreement and the First through Fourth Amendments. The Court finds that the following testimony and evidence, taken together, establish that Calhoun understood the first five transactions with Wentworth and freely entered into each of them: the observations and representations by Calhoun's counsel that Calhoun was entering into those transactions of her own free will and volition and without any duress by Wentworth; the testimony by Calhoun's family members and treating physician that her mental condition did not begin to deteriorate until some point in time after these five transactions had taken place; the testimony by Attorney Quance that Calhoun understood the transactions and entered into them freely and without being under any duress imposed by Wentworth; and the fact that Calhoun's then husband, Vernon Howland, whose mental competency has not been challenged, co-signed on the Purchase Agreement and several of the Amendments to the Purchase Agreement.

50.    Wentworth exerted no pressure on Calhoun to enter into any of the transactions between the two parties.

51.    Calhoun died on May 1, 2000.

52.    Calhoun's "Last Will and Testament" was filed with the Highland County Court of Common Pleas, Probate Division ("Probate Division") on May 19, 2000.

21

53.    Wentworth filed a claim dated November 28, 2000, against Calhoun's Estate, stating:

Wentworth's valid claim for money owed by the estate of Calhoun is set forth in her Last Will and Testament, Item XIII, prepared by you and attached hereto.  Wentworth's claim is for those monies set forth in paragraph XIII as summarized as follows:

A) Monthly payments of $1,500 each ending on 9/1/2003;

B) One lump sum payment of $80,000 due on 11/1/2000;

C) Twenty-six monthly payments of $1,500.00 each, beginning on 10/1/2003 and

ending on 11/1/2005;

D) One lump sum payment of $50,000.00 due on 11/1/2005 with J.G. Wentworth

retaining $35,000.00 and returning the remainder to the client;

E) One lump sum payment of $100,000.00 due on 11/1/2010 with J.G. Wentworth

retaining $85,000.00 and returning the remainder to the client;

F) One lump sum payment of $100,000.00 due on 11/1/2015 with J.G. Wentworth

retaining $50,000.00 and returning the remainder to the client; and

G) One lump sum payment of $35,000.00 due on 11/1/2003.

(Plaintiff's Exh. 58).

54.    On March 21, 2001, the Calhoun Estate served a "Rejection of Claim" on plaintiff's attorney

James S. Wertheim, Michele Meyers of First Colony, and Wentworth, over the signature of

Linda Calhoun Williams, Executrix of the Estate of Ramona F. Calhoun.  (Plaintiff's Exh.

62). No reason for the rejection is stated on the document.

55.    On June 21, 2001, the Probate Division ordered that no assets will be distributed from the

Estate unless ordered by the Probate Division.

56.    The payments due under the Annuity Policy after Calhoun's death are assets of the Calhoun Estate.  The payments are paid as they become due to the Calhoun Estate, as the beneficiary of the Annuity Policy, and are held by the Executrix under order of the Probate Division in a bank in Greenfield, Ohio.  The monies received to date are $1,500.00 a month since Calhoun's death and a November 1, 2000 lump sum payment in the amount of $50,500.00. It is assumed that all payments have been paid when due.  The payments are subject to the jurisdiction and control of the Probate Division.

57.    There is presently pending a Will contest, Case No. 001104-A, in the Probate Division, to which Wentworth and Williams are defendants.  Until the Will contest reaches final judgment, and until further Order of the Probate Division, the Executrix is not required to distribute the assets of the Calhoun Estate under the terms of the Will.  Ohio Rev. Code § 2113.53.

### B. Conclusions of law

1.    On August 13, 2001, this Court denied without prejudice defendant's Motion to Dismiss for Lack of Jurisdiction (doc. 15).  The parties stipulated in the final pretrial order that this Court has jurisdiction over the parties, which this Court accepts.  The jurisdiction of the Court over the subject matter in this lawsuit, however, cannot be waived.

2.    The subject matter jurisdiction of this Court in this lawsuit is circumscribed.  A federal court has no jurisdiction to probate a will or administer an estate.  ***Markham v. Allen***, 326 U.S. 490, 494 (1946).  Federal courts in equity do have jurisdiction to entertain suits "in favor of creditors, legatees and heirs" and other claimants against a decedent's estate "'to establish their claims,' so long as the federal court does not interfere with the probate proceedings, assume general jurisdiction of the probate proceedings, or assume control of the property in the custody of the state court."  ***Id.***  "Similarly, while a federal court may not exercise its jurisdiction to disturb or affect the possession of property in the custody of a state court. . . it may exercise its jurisdiction to adjudicate rights in such property where the final judgment does not undertake to interfere with the state court's possession save to the extent that the state court is bound by the judgment to recognize the right adjudicated by the federal court." ***Id.*** (citations omitted).

3.    This Court has diversity jurisdiction to adjudicate rights of claimants against the Calhoun Estate so long as this Court does not interfere with the probate proceedings or assume general jurisdiction of the probate or control of the property in the custody of the state court.

4.    This Court has no subject matter jurisdiction to order payment into the federal court of the funds held under the June 21, 2001 order of the Probate Division, as requested by Wentworth, or to determine the validity of the purported Will, which is the subject of a Will contest action in the Probate Division.

5.    This Court does have subject matter jurisdiction to determine the remaining issues raised by the parties.

6.    To prove a claim for breach of the Purchase Agreement and the Amendments, plaintiff must

show (1) the existence of an enforceable agreement; (2) performance of its obligations; (3)

breach or failure to fulfill obligations; and (4) damage or loss resulting from the breach.

***Belcher v. Ohio Dept. of Human Services,*** 48 F.Supp.2d 729, 738 (S.D. Ohio 1999)(citing

***Garofalo v. Chicago Title Ins. Co.,*** 104 Ohio App.3d 95, 108, 661 N.E.2d 218 (1995)).

7.    A binding agreement is created by an offer and acceptance resulting in a meeting of the

minds of the parties, supported by a mutual exchange of appropriate consideration. ***Energy***

***Marketing Services, Inc. v. Homer Laughlin China Co.,*** 186 F.R.D. 396, 374 (S.D. Ohio

1999).

8.    Once consideration is shown, a court generally may not inquire into the adequacy of the

consideration. See ***Lake Land Empl. Group of Akron, LLC v. Columber,*** 101 Ohio St.3d

242, 248, 804 N.E.2d 27, 33 (2004); ***Nilavar v. Osborn,*** 127 Ohio App.3d 1, 15, 711 N.E.2d

726, 735 (1998)(citing ***Ford v. Tandy Transp., Inc.,*** 86 Ohio App.3d 364, 384, 620 N.E.2d

996, 1009 (1993).

9.    Conversion is "a wrongful exercise of dominion over property in exclusion of the right of

the owner, or withholding it from his possession under a claim inconsistent with [the

owner's] rights." ***NPF IV, Inc. v. Transitional Health Services,*** 922 F.Supp. 77, 80-81 (S.D.

Ohio 1996)(citing ***Zacchini v. Scripps-Howard Broadcasting Co.,*** 47 Ohio St.2d 224, 226,

351 N.E.2d 454 (1976), ***reversed on other gds,*** 433 U.S. 562 (1977)).

10.     To prove a claim of conversion, the owner of the property must demonstrate "(1) plaintiff's ownership or right to possession of the property at the time of the conversion; (2) defendant's conversion by a wrongful act or disposition of plaintiff's property rights; and (3) damages." *Transitional Health,* 922 F.2d at 81 (citations omitted).

11.     "The measure of damages in a conversion action is the value of the converted property at the time it was converted." *Kraft Construction Co. v. Cuyahoga County Bd. of Commissioners,* 128 Ohio App.3d 33, 41, 713 N.E.2d 1075, 1080 (1998)(citing *Brumm v. McDonald & Co. Securities, Inc.,* 78 Ohio App.3d 96, 603 N.E.2d 1141 (1992)).

12.     "An action for unjust enrichment will lie where a party retains money or a benefit that in equity or justice belongs to another." *Hartley v. Dayton Computer Supply,* 106 F.Supp.2d 976, 984 (S.D. Ohio 1999)(citation omitted).

13.     To prove a claim for unjust enrichment, plaintiff must show "(1) a benefit conferred by a plaintiff upon a defendant; (2) knowledge by the defendant of the benefit; and (3) retention of the benefit by the defendant under circumstances where it would be unjust to do so without payment." *Hambleton v. R.G. Barry Corp.,* 12 Ohio St.3d 179, 183, 465 N.E.2d 1298, 1302 (1984)(quoting *Hummel v. Hummel,* 133 Ohio St. 520, 525, 14 N.E.2d 923 (1938)).

14.     The measure of damages in an unjust enrichment case is the benefit realized by the defendant. *Hartley,* 106 F.Supp.2d at 984.

15.    Where the parties' dispute is the subject of a contractual agreement, a party cannot invoke

the doctrine of unjust enrichment. ***Davis & Tatera, Inc. v. Gray-Syracuse, Inc.,*** 796 F. Supp.

1078, 1085 (S.D. Ohio 1992)(citing ***Ryan v. Rival Mfg. Co.,*** 1981 WL 10160 * 1 (Ohio 1st

App. Dist., Dec. 16, 1981)); ***Weiper v. W.A. Hill & Assoc.,*** 104 Ohio App.3d 250, 262, 661

N.E.2d 796 (1995).

16.    In order to establish an intentional misrepresentation claim under Ohio law, a plaintiff must

establish the following elements: 1) a representation, 2) that is material to the transaction at

hand, 3) made falsely, with knowledge of its falsity, or with such utter disregard and

recklessness as to whether it is true or false that knowledge may be inferred, 4) with the

intent of misleading another into relying upon it, 5) justifiable reliance upon the

representation, and 6) a resulting injury proximately caused by the reliance. ***Burr v. Bd. of***

***County Commrs. of Stark County,*** 23 Ohio St.3d 69, 73, 491 N.E.2d 1101, 1105 (1986).

17.    Reliance on a fraudulent misrepresentation is justified if the representation does not appear

to be unreasonable on its face and there is no apparent reason to doubt its veracity.

***Greenberg v. Life Insurance Co. of Virginia,*** 177 F.3d 507, 516 (6th Cir. 1999)(citing

***Lepera v. Fuson,*** 83 Ohio App.3d 17, 613 N.E.2d 1060, 1065 (1992)).

18.    Fraud in the inducement occurs when a party is induced to enter into an agreement through

fraud or misrepresentation. ***ABM Farms, Inc. v. Woods,*** 81 Ohio St.3d 498, 502, 692 N.E.2d

574, 578 (1998)(citing ***Haller v. Borror Corp.,*** 50 Ohio St.3d 10, 14, 552 N.E.2d 207, 210

(1990)). "The fraud relates not to the nature or purport of the [agreement], but to the facts

inducing its execution." ***Id.***

27

19. In order to prove fraud in the inducement, plaintiff must prove that a defendant made a "knowing, material misrepresentation with the intent of inducing the plaintiff's reliance, and that the plaintiff relied upon that misrepresentation to her detriment." *Id.* (citing *Beer v. Griffith,* 61 Ohio St.2d 119, 123, 399 N.E.2d 1227, 1231 (1980)).

20. A classic claim of fraud in the inducement alleges that a misrepresentation of facts outside the agreement or other wrongful conduct induced a party to enter into the agreement. *Id.* at 503.

21. Where a party seeks to rescind an agreement on the ground that it was procured by fraudulent representations, it must prove the elements of fraud by clear and convincing evidence. *Schulz v. Sullivan,* 92 Ohio App.3d 205, 209, 634 N.E.2d 680, 682 (1993).

22. One who is injured by an intentional misrepresentation is entitled to the damages sustained by reason of the misrepresentation that have naturally and proximately resulted from the misrepresentation. *Burr,* 23 Ohio St.3d at 74, 491 N.E.2d at 1106.

23. Absent a successful will-contest action, an executrix of an estate has the duty to administer the estate and to distribute the assets in accordance with the terms of the testator's will. *Zuendel v. Zuendel,* 63 Ohio St.3d 733, 737, 590 N.E.2d 1260, 1263 (1992).

24. Under Ohio law, a party asserting a defense of equitable estoppel must prove (1) that the opposing party made a factual misrepresentation, (2) that was misleading, (3) the misrepresentation induced actual reliance which is reasonable and in good faith, and (4) the misrepresentation caused detriment to the relying party. *Doe v. Blue Cross/Blue Shield of Ohio,* 79 Ohio App.3d 369, 379, 607 N.E.2d 492, 498 (1992)(citing *First Fed. S & L Ass'n v. Perry's Landing, Inc.,* 11 Ohio App.3d 135, 145, 463 N.E.2d 636, 648 (1983)).

25.    A waiver is a voluntary relinquishment of a known right. ***State ex rel. Wallace v. State Med.
Bd. of Ohio,*** 89 Ohio St.3d 431, 435, 732 N.E.2d 960, 965 (2000)(citation omitted).

26.    Bad faith has been described as "a dishonest purpose, moral obliquity, conscious
wrongdoing, breach of a known duty through some ulterior motive or ill will partaking of
the nature of fraud. It also embraces actual intent to mislead or deceive another." ***Helmick
v. Republic-Franklin Insurance Co.,*** 39 Ohio St.3d 71, 75 n.1, 529 N.E.2d 464, 468 n. 1
(1988).

27.    Payment is the discharge of a pecuniary obligation by money or by an accepted equivalent.
***Hasbrook v. Wingate,*** 152 Ohio St. 50, 57, 87 N.E.2d 87, 91 (1949).

28.    A party asserting duress must prove "(1) that one side involuntarily accepted the terms of
another; (2) that circumstances permitted no other alternative; and (3) that said
circumstances were the result of coercive acts of the opposite party." ***Blodgett v. Blodgett,***
49 Ohio St.3d 243, 246, 551 N.E.2d 1249, 1259 (1990).  "Merely taking advantage of
another's financial difficulty is not duress.  Rather, the person alleging financial difficulty
must allege that it was contributed to or caused by the one accused of coercion." ***Id.*** (citing
WILLISTON ON CONTRACTS (3rd Ed. 1970) 708, § 1617).

29.    Duress must be proved by clear and convincing evidence. See ***DiPietro v. DiPietro,*** 10 Ohio
App.3d 44, 46, 460 N.E.2d 657, 661 (1983); See also ***Rheinscheld v. McKinley,*** 1988 WL
6553 (Ohio 4th App. Dist. Jan. 27, 1988).

30.    "To avoid an [agreement] on the basis of duress, a party must prove coercion by the other party to the agreement. It is not enough to show that one assented merely because of difficult circumstances that are not the fault of the other party." ***Blodgett,*** 49 Ohio St.3d at 246, 551 N.E.2d at 1249, syll.

31.    "Generally, [agreements] or clauses thereof are 'unconscionable' where one party has been misled as to the 'basis of the bargain,' where a severe imbalance in bargaining power exists, or where specific contractual terms are outrageous." ***Orlett v. Suburban Propane,*** 54 Ohio App.3d 127, 129, 561 N.E.2d 1066, 1069 (1989)(citation omitted).

32.    In determining procedural unconscionability, "all the circumstances surrounding the transaction including the manner in which the [agreement] was entered into, whether each party had a reasonable opportunity to understand the terms of the [agreement], and maze of fine print" are to be considered. ***Jones v. Asgrow Seed Co.,*** 749 F. Supp. 836, 838 (N.D. Ohio 1990).

33.    Under certain circumstances, an agreement can be rescinded based on mutual mistake. ***Reilley v. Richards,*** 69 Ohio St.3d 352, 632 N.E.2d 507, 508 (1994). Ohio courts follow the test enunciated in the Restatement of the Law when addressing the issue of mutual mistake. ***Id***. In accordance with that test, the parties' intention must have been frustrated by the mutual mistake. ***Id.*** at 353 (citing 1 RESTATEMENT (SECOND) OF CONTRACTS § 152(1) (1981)).

34.  Reformation of an agreement based on mutual mistake is authorized only where there is clear proof that the parties made the same mistake and that both parties understood the contract as the complaint asserts it ought to have been. ***Merrill v. City of Hamilton,*** 9 Ohio App.3d 111, 458 N.E.2d 860, syll. (1982)(citing ***Mulby v. Dunham,*** 29 Ohio App. 51, 162 N.E. 718 (1927)).

35.  Defendant's affirmative defense that plaintiff committed usury in violation of Ohio Rev. Code § 1343.01 is not meritorious. The written Purchase Agreement and six Amendments to the Purchase Agreement between Wentworth and Calhoun are not written instruments for the "forbearance of payment of money at any future time" as to which the parties stipulated for the payment of interest. Accordingly, § 1343.01 does not apply to the parties' transactions.

36.  Defendant has not established the defense of equitable estoppel. Defendant has not proved that plaintiff made any factual misrepresentations to Calhoun in connection with Calhoun's Purchase Agreement with Wentworth and the subsequent Amendments to the Purchase Agreement.

37.  Defendant has not established the defense of fraud in the inducement. Defendant has not established that plaintiff engaged in fraud or made any misrepresentations to Calhoun that induced her to enter into the Purchase Agreement and subsequent Amendments with plaintiff.

38.  Defendant has not established that Wentworth voluntarily relinquished its rights to any payments due and owing to it.

39.  The evidence does not support a finding that Wentworth subjected Calhoun to any duress in connection with the transactions between the parties.

40.    Defendant has not established that plaintiff acted in bad faith. There is no evidence that plaintiff intentionally misled or deceived Calhoun or that Wentworth acted with a dishonest or improper purpose. Nor does the evidence support a finding that plaintiff knowingly took advantage of Calhoun in any respect. To the contrary, plaintiff required Calhoun to secure independent legal counsel in connection with each of the transactions and relied on counsel's representations regarding plaintiff's capacity to understand the transactions and her willingness to enter into the transactions voluntarily and without duress.

41.    The evidence does not support a finding that the five transactions with Wentworth that pre-date 1998 are invalid because Calhoun lacked the mental capacity to understand and freely enter into those transactions.

42.    Calhoun's mental capacity at the time she signed the last two Amendments to the Purchase Agreement is not material to this litigation. Calhoun had no rights in the payments that are the subject of those Agreements, and there is no evidence that the Calhoun Estate has received, and is seeking to retain, those payments.

43.    Whether the agreements whereby Wentworth agreed to purchase from Calhoun her purported rights in the annuity payments listed in the Fifth and Sixth Amendments were the result of mutual mistake on the part of Wentworth and Calhoun is likewise not material for two reasons. First, as stated above, there is no evidence that the Estate has received, and is seeking to retain, the annuity payments that are the subject of those Amendments. Second, there is no evidence that the amounts that Calhoun received from Wentworth for the sale of her purported rights in those payments are part of the Calhoun Estate.

44.    The Court finds that the Purchase Agreement and Amendments between Wentworth and Calhoun are not unconscionable and are therefore not violative of Ohio public policy. Calhoun freely sought out Wentworth's services and freely chose to accept the offers extended to her by Wentworth without any pressure from Wentworth. It is clear from the documents and counsel's testimony that the terms of the Purchase Agreement, the four Amendments to the Purchase Agreement, and the nature of the transactions entered into prior to 1998 were fully explained to Calhoun. By obtaining independent legal counsel as required by Wentworth in connection with each of the transactions, Calhoun had a reasonable opportunity to understand the terms and the nature of the transactions, as well as what she was forfeiting by entering into the agreements. Although one could reasonably conclude that the terms of the offers were unfavorable to Calhoun and that the offers were not a good deal for her, one could likewise reasonably conclude based on the testimony of Calhoun's family that she was willing to accept the terms because she wanted to have and enjoy some of the money due to be paid to her in the future to spend during her lifetime, and the only way she could accomplish this was by availing herself of the service Wentworth offered.

45.   By purchasing Calhoun's rights to receive the annuity payments, if living, Wentworth assumed the risk that Calhoun's untimely death would terminate her rights to receive the annuity payments and that the remaining annuity payments would belong to the beneficiary named by Royal Insurance Company in the Annuity Policy.  This is made clear by Section 3(b)(i)(ii) of the Purchase Agreement, whereby the parties agreed that Calhoun would cause Wentworth to be named  the beneficiary in the Annuity Policy to receive the annuity payments  in the event of the untimely death of Calhoun.  The change of beneficiary from Calhoun's children to the Estate of Ramona Calhoun, rather than to Wentworth,  greatly increased Wentworth's risk of not receiving the annuity payments in the event of Calhoun's untimely death.

46.   Wentworth has not established its claim for unjust enrichment.  The payments that have been made under the Annuity Policy subsequent to Calhoun's death are being held by the Executrix under an Order of the Probate Division.  The Estate is not being unjustly enriched by the mere holding of those payments pending an Order of distribution by the Probate Division.

47.   More specifically, there is no basis for finding that the Calhoun Estate is retaining a benefit that rightfully belongs to Wentworth in the form of the annuity payments that are the subject of the Fifth and Sixth Amendments to the Purchase Agreement.  Calhoun agreed to assign to Wentworth her rights in the annuity payments that were to be made to her, if living, and to deliver the payments to Wentworth when received.  As stated above, plaintiff has not presented evidence showing that Calhoun had any rights in the lump sum payments that are the subject of the Fifth and Sixth Amendments to the Purchase Agreement. Annuity payments

in which Calhoun had no rights are not part of the Estate.

48.    Wentworth is not entitled to recover from Calhoun's Estate in this action the amounts it paid to Calhoun under the Fifth and Sixth Amendments to the Purchase Agreement for her purported rights in annuity payments that she was not, in fact, entitled to receive. Wentworth paid those monies to Calhoun before she died, and there is no evidence that those monies that Calhoun received from Wentworth prior to her death are part of the Calhoun Estate.

49.    There is no basis for finding that there was a failure of consideration for inclusion of the testamentary provision in the Will.  According to the Fifth Amendment to the Purchase Agreement, in exchange for the payment from Wentworth for Calhoun's purported rights in one lump sum annuity payment, Calhoun agreed to assign her purported rights in this annuity payment to Wentworth, and she also agreed to new terms governing her relationship with Wentworth.  She agreed to new subsection 1(5) - "Confession of Judgment, Consent to Jurisdiction and Waiver of Jury Trial;" an amendment to Section 17 entitled "Controlling Law," now subsection 1(6); and to a new section 1(7) entitled "Severability."  These agreements by Calhoun reduced Wentworth's risk of not receiving the assigned annuity payments set forth in the Purchase Agreement and the Amendments to the Purchase Agreement.

35

50.     In consideration of the Sixth Amendment to the Purchase Agreement, Calhoun received payment from Wentworth for her rights in certain annuity payments.  In return, Calhoun agreed to assign her purported rights in the future payments to Wentworth, and to make a Will naming Wentworth as a legatee under Item XIII and bequeathing to Wentworth the payments it would have received if Wentworth had been named the beneficiary in the Annuity Policy as originally agreed.  This act on Calhoun's part greatly benefitted Wentworth by removing additional risk that Wentworth had agreed to assume in buying Calhoun's rights to receive certain payments, if living.

51.     To reduce the risk assumed by Wentworth of the untimely death of Calhoun, it was essential for Wentworth to induce Calhoun to make a will containing the provision provided by Wentworth that was included in her purported Will at Item XIII.  Calhoun agreed to incorporate in her Will Item XIII as written by Wentworth.  Calhoun performed her agreement.  If the Will signed February 1, 2000, is ultimately adjudged to be Calhoun's Last Will and Testament, Wentworth will receive the benefit of its bargain.  There is no reason to reform the Fifth and Sixth Amendments to the Purchase Agreement.

52.    Williams did not breach her fiduciary obligation to Wentworth as a beneficiary of the Will by initially denying Wentworth's claim. Williams had colorable reasons for denying the claim, i.e., a belief that the Purchase Agreement and the Amendments between Wentworth and Calhoun were unconscionable and that Calhoun lacked the mental capacity to understand and freely enter into the transactions, and Williams denied the claim on the advice of counsel. In addition, Part B of Wentworth's claim, which is for "One lump sum payment of $80,000 due on 11/1/2000," is inaccurate. The lump sum payment due on November 1, 2000, was for $50,000.00   Part D of Wentworth's claim, which is for "One lump sum payment of $50,000.00 due on 11/1/05, with J.G. Wentworth retaining $35,000.00 and returning the remainder to the client," likewise appears to be inaccurate since Wentworth purchased only $25,000.00 of that payment as part of the Third Amendment to the Purchase Agreement.

53.    Plaintiff has not established its claim for intentional misrepresentation. Plaintiff did not present evidence that Williams made representations through Curren and Susan Daniels, the attorneys for the Calhoun Estate and Williams' alleged agents, that were not accurate when made on November 8, 2000, and the attorneys clearly stated, "I will be happy to work with you in regard to any payments legally due and payable to your client." (Plaintiffs Exh. 55).

54.    Wentworth purchased from Calhoun her rights to receive, if living, annuity payments authorized by the Annuity Policy. Wentworth has received those payments. Wentworth's right to receive the annuity payments becoming payable after Calhoun's death on May 1, 2000, exists because Wentworth was named as a legatee in what purports to be Calhoun's Last Will and Testament. Wentworth is not a beneficiary named in the Annuity Policy. The Calhoun Estate is the named beneficiary.

55.  As Executrix of the Calhoun Estate, Williams is in lawful possession of the annuity payments that have come into her possession and which are controlled by the Probate Division by its order issued June 21, 2001.  Wentworth has no right of possession in the annuity payments until the validity of the Will is established.  Wentworth's conversion claim has no merit.

## V. Judgment

Pursuant to the foregoing, Plaintiff's Motion for Order that Funds be Deposited with Court (doc. 85) is **DENIED**.

Pursuant to the foregoing, the Court finds against plaintiff Wentworth and in favor of defendant Williams on Wentworth's claims for unjust enrichment (Count II), conversion (Count III), misrepresentation (Count IV), and breach of fiduciary duty (Count V).  These claims are **DISMISSED WITH PREJUDICE**.

Pursuant to the foregoing, the Court finds against defendant Williams and in favor of plaintiff Wentworth on Williams' counterclaims.  Defendant Williams' counterclaims are **DISMISSED WITH PREJUDICE**.

Pursuant to the foregoing, Wentworth's request for declaratory judgment in Count I is **GRANTED IN PART**. This Court declares that the Purchase Agreement and the Amendments to the Purchase Agreement are valid agreements. Prior to her death, Calhoun fulfilled her contractual obligations to Wentworth. Wentworth fulfilled its contractual obligations to Calhoun. Wentworth paid Calhoun $122,168.85 for the possibility to receive annuity payments that had the present value of $240,519.40 at the time Wentworth and Calhoun entered into the Purchase Agreement and the six Amendments to the Purchase Agreement. When Calhoun named Wentworth as a legatee in Item XIII of her purported Last Will and Testament, Calhoun fulfilled her obligations to Wentworth to secure to it the benefit of its bargain. Neither party is entitled to rescind the Purchase Agreement or any of the six Amendments to the Purchase Agreement.

Pursuant to the foregoing, Wentworth's request for declaratory judgment and a Court Order in Count I is **DENIED IN PART**. Because the Court has determined that the annuity payments in the amounts of $20,000.00 due November 1, 2000, $10,000.00 due November 1, 2000, and $35,000.00 due November 1, 2003, will never be paid to the Estate, the Court will not issue an order requiring Williams to deliver these annuity payments to Wentworth, as Wentworth received the benefit of its bargain. Wentworth's claim for judgment in the amount of $35,370.55, plus interest and costs, based on the monies that Wentworth paid to Calhoun for her purported rights in these annuity payments is **DENIED** and **DISMISSED WITH PREJUDICE**.

Each party has requested costs, attorney fees, and interest.  The Court holds that neither party is entitled to an award of attorneys' fees or interest in this proceeding.  Because Wentworth has prevailed on its request for a declaration of the validity of the Purchase Agreement and the six Amendments to the Purchase Agreement, Wentworth is entitled to recover its costs as provided by statute.

This case is **TERMINATED** on the docket of this Court.

**IT IS SO ORDERED.**

s/Herman J. Weber
_____
HERMAN J. WEBER
SENIOR JUDGE, UNITED STATES DISTRICT COURT

J:\HJWA\01-192ord.wpd